# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BP PLC, | Case No. |
| Plaintiff, | Section |
| v. | Magistrate |
| ANTHONY B. HAYWARD, IAIN C. CONN, ROBERT W. DUDLEY, BYRON E. GROTE, ANDY G. INGLIS, CARL-HENRIC SVANBERG, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA B. CARROLL, SIR WILLIAM M. CASTELL, GEORGE DAVID, IAN DAVIS, DOUGLAS J. FLINT, DEANNE S. JULIUS, H. LAMAR MCKAY, TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., CAMERON INTERNATIONAL CORPORATION, HALLIBURTON ENERGY SERVICES INC., "A, B, AND C" INSURANCE COMPANIES AS INSURERS OF TRANSOCEAN, "L, M, AND N" INSURANCE COMPANIES AS INSURERS OF CAMERON INTERNATIONAL, AND "X, Y, AND Z" INSURANCE COMPANIES AS INSURERS OF HALLIBURTON, | **Jury Trial Demanded** |
| Defendants, | |
| and | |
| BP PLC, | |
| Nominal Defendant. | |

## STATEMENT OF RELATED CASES

This action (as constituted by the attached Verified Shareholder Derivative Complaint) is related to other cases pending in this District:

*Firpo v. Hayward, et al.*, No. 10 Civ. 1430 (E.D. La. filed May 7, 2010) (shareholder derivative proceeding containing similar allegations).

Dated:  May 10, 2010.

Respectfully submitted,

KAHN SWICK & FOTI, LLC

By: _____
Lewis S. Kahn (La. Bar No. 23805)
Albert M. Myers (application for *pro hac vice*
    admission pending)
Paul Balanon (La. Bar No. 29076)
Melinda Nicholson (application for *pro hac vice*
    admission pending)
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

*Attorneys for Plaintiff*

**Of counsel:**

BERNSTEIN LITOWITZ BERGER & GROSSMANN PLC

G. Anthony Gelderman III (La. Bar No. 17594)
2727 Prytania Street, Suite 14
New Orleans, LA 70130
Tel. (504) 899-2339
Fax: (504) 899-2342
*tony@blbglaw.com*

Gerald H. Silk
Amy Miller
Jeremy Friedman
1285 Avenue of the Americas
New York, NY 10019
Tel. (212) 554-1400
Fax: (212) 554-1444
*jerry@blbglaw.com*
*amym@blbglaw.com*
*jeremyf@blbglaw.com*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BP PLC,

             Plaintiff,

     v.

ANTHONY B. HAYWARD, IAIN C. CONN, ROBERT W. DUDLEY, BYRON E. GROTE, ANDY G. INGLIS, CARL-HENRIC SVANBERG, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA B. CARROLL, SIR WILLIAM M. CASTELL, GEORGE DAVID, IAN DAVIS, DOUGLAS J. FLINT, DEANNE S. JULIUS, H. LAMAR MCKAY, TRANSOCEAN LTD., TRANSOCEAN DEEP-WATER, INC., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., CAMERON INTERNATIONAL CORPORATION, HALLIBUR-TON ENERGY SERVICES INC., "A, B, AND C" INSURANCE COMPANIES AS INSURERS OF TRANSOCEAN, "L, M, AND N" INSURANCE COMPANIES AS INSURERS OF CAMERON INTERNATIONAL, AND "X, Y, AND Z" INSURANCE COMPANIES AS INSURERS OF HALLIBURTON,

             Defendants,

       and

BP PLC,

             Nominal Defendant.

Case No.

Section

Magistrate

**Jury Trial Demanded**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff"), by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant BP Plc ("BP" or the

"Company") against certain directors and officers of BP and other defendants (collectively, "Defendants").   Plaintiff bases its allegations on actual knowledge as to its own acts and on information and belief as to all other allegations after due investigation by its counsel.

## SUMMARY OF THE ALLEGATIONS

1.      This derivative lawsuit arises from the disastrous consequences of Defendants' choice to maximize output at the Company's production facilities instead of ensuring that the Company complied with safety regulations.   The failure of the BP Board of Directors (the "BP Board", the "Board of Directors" or the "Board") and certain officers of BP to comply with their fiduciary duties and the improper conduct of the other defendants caused one of the worst oil spills in the history of the United States, leaving 11 men dead, contaminating roughly 4,000 square miles of marine life and causing billions of dollars in harm to coastal businesses and residents, as well as to BP itself.

2.      The BP Board has been unable to regulate or reform the Company's troubled safety record in recent years despite deadly accidents and repeated promises of improvement.

3.      In 2005, a BP refinery in Texas City, Texas exploded, killing 15 workers (the "Texas City Explosion").   Following the Texas City Explosion, the Company announced it would address the safety violations that contributed to the deadly explosion.

4.      In 2007, after settling many claims related to the Texas City Explosion, BP's newly appointed Chief Executive Officer Tony Hayward acknowledged that the BP Board and executives were on notice that Company was operating in a hazardous manner and safety improvements were drastically needed.   At this time, the Company stated, "[o]ur operations failed to meet our own standards and the requirements of the law."   Moreover, the Company recognized the need to improve its "risk management."

2

5.      Since then, the BP Board and the Company's executives have failed to adequately implement and monitor any effective safety initiatives on behalf of BP.  These failures have cost employees their lives and made the Company incur billions of dollars in damages.  The Defendants' complete failure in this regard is remarkable.  According to RiskMetrics, BP has a worse health, environment and safety record than almost any other major oil company.  As described by Congressman Bart Stupak of Michigan when asked about BP's persistent safety issues, "[i]t is a corporate problem.  Their mentality is to get in a foxhole and batten down the hatch.  It just seems there is this pattern."

6.      As a result of BP's failures, on April 20, 2010, a mass of oil or natural gas erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico (the "Gulf") off the shores of Louisiana, engulfing the Deepwater Horizon oil rig (the "Rig") managed by BP in fire and sinking the Rig 36 hours later (the "Deepwater Disaster").  The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil leak in the Gulf, covering at least 3,850 square miles of fragile ocean and endangering wetlands marine life.  The Deepwater Disaster threatens to become the worst oil spill in history, endangering the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come and wiping out the habitat of hundreds of species of marine and oceanic life.  More than 400 species, including whales and dolphins, face a dire threat from the spill, along with Louisiana's barrier islands and marshlands.

7.      The Deepwater Disaster will cause financial consequences to BP, which will be tabulated in the tens of billions of dollars, including liability for damage to property, commercial interests and wildlife.  These damages include estimated losses to the fishing industry of no less than $2.5 billion and to the tourism industry of no less than $3 billion.  BP's efforts to try to stop the oil spill and remediate its effects have cost $350 million so far, with the Company accruing

additional costs of at least $6 million per day.  Following the disaster, BP's stock price has dropped by over 19 percent, wiping out around *$37 billion* of BP's market value.

8.     The consequences of the Deepwater Disaster will also be felt by the families of the deceased and injured workers, commercial fishermen, Gulf coast property owners, and the environment at large for generations —for which losses the affected parties have, understandably, commenced several legal actions against the culpable parties, including many of the Defendants named herein.  The tragic losses of these persons are deeply felt by Plaintiff herein, who is a shareholder of BP that represents the interests of thousands of employees and retirees located in Louisiana, which is and will continue to suffer the effects of this disaster.

9.     The BP defendants have a long history of ignoring crucial safety issues related to the operation of offshore submersible rigs such as this Rig, including problems with the crucial blowout preventer devices that so spectacularly failed during this disaster.  In addition after ignoring safety violations, an incident occurred at the Rig in 2008, where 77 people were evacuated from the Rig after it listed over and began to sink after an employee accidentally removed a section of pipe from the Rig's ballast system.

10.     Despite repeated incidents serving as "red flags" of the possibility of a major explosion and oil spill in the Gulf, the BP defendants elected to cut costs, including safety and maintenance expenditures, in pursuit of profitable results to report to Wall Street.  These defendants also lobbied the federal and state governmental authorities to remove or decrease the extent of safety and maintenance regulation of the Company's Gulf operations, claiming, against all evidence, that "voluntary compliance" would suffice to address safety and environmental concerns.  Even after a 2006 shareholder derivative proceeding brought as a last resort to require BP to address safety concerns was voluntarily settled out-of-court by the BP defendants, these

defendants continued to ignore and disregard safety issues concerning the Company's deepwater operations, making purely cosmetic changes at the corporate level while ignoring the substance of the safety violations and the threat they posed to the entirety of the Gulf, commercial and private property, and the Company's own survival as a going concern.

11.     Plaintiff brings this action not only against the BP defendants, who are directors and officers of the Company, who disregarded their fiduciary duties of loyalty, care, oversight, and good faith with respect to the Company's very existence, but also against the third parties who may be held responsible for the effects of the Deepwater Disaster, including Transocean Ltd., the owner/operator of the rig, Cameron International Corporation, which manufactured the malfunctioning blowout preventer at issue, and Halliburton Energy Services, Inc., which was servicing the cement casing to seal off the wellhead at the time of the explosion.  Whatever the liability of these defendants to third parties, these parties are liable to BP for their own negligence and other misconduct in causing the Deepwater Disaster and damaging the Company. Plaintiff asserts these claims because the BP defendants themselves, including the Board of Directors, cannot and will not do so.

## PARTIES

12.     Plaintiff LAMPERS is a retirement system created for the purpose of providing retirement allowances and other benefits for full-time municipal police officers and employees in the state of Louisiana, secretaries to chiefs of police and employees of this retirement system. LMPERS is a current shareholder of BP, has been a stockholder of BP at all material times alleged in this Complaint and will continue to be a stockholder of BP through the conclusion of this litigation.  LAMPERS is a citizen of Louisiana.

5

13.     Nominal Defendant BP Plc ("BP") is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  BP is one of the three largest integrated energy services companies in the world, with more than 100,000 employees and operations in more than 100 countries on six continents.  BP is the largest U.S. oil and gas producer.  BP does business in Louisiana and within this District.

14.     BP is incorporated under English law, which permits this action to be maintained based on the allegations herein.  Moreover, due to BP's extensive U.S. and Louisiana operations, the large number of BP shareholders in the U.S., and the situs of the wrongdoing, this District is manifestly the most appropriate venue for this action.

15.     BP's ties to—and impact on—the U.S. is highlighted by the following:

- 39 percent of BP's worldwide shareholders reside in the U.S.

- BP has approximately 34,000 employees in the U.S., one third of its total worldwide employees and more than in any other country.

- BP produces more crude oil in the U.S. than in any other country.

- BP produces more natural gas in the U.S. than in any other country.

- BP's capital expenditures in the U.S. are larger than in any other country, and BP has more operating capital employed in the U.S. than in any other country.

16.     Defendant Anthony B. Hayward is the Chief Executive Officer and a member of the Board of Directors.  He has served as Chief Executive Officer since 2007 and as an Executive Director since 2003.  Before becoming Chief Executive Officer, Hayward, who joined BP in 1982, served as the Chief Executive Officer of Exploration and Production from 2002 to 2007.  In exchange for his purported trust, loyalty, and fidelity to BP, Hayward received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £2,509,000 in 2008 and £3,158,000 in 2009.  He is a citizen of the United Kingdom.

17.     Defendant Iain C. Conn has served as BP's head of refining and marketing since 2007 and as an Executive Director of the Board of Directors since 2004.  He joined BP in 1986 and served in a variety of roles, including group vice president of BP's refining and marketing business from 2000 to 2002, chief executive of petrochemicals from 2002 to 2004, and group executive officer from 2004 to 2007, before being appointed head of refining and marketing.  In exchange for his purported trust, loyalty, and fidelity to BP, Conn received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £1,586,000 in 2008 and £1,840,000 in 2009.  He is a citizen of the United Kingdom.

18.     Defendant Robert W. Dudley has served as BP's Managing Director and Executive Director on the Board of Directors since April 2009.  Dudley joined the Amoco Corporation, which merged with BP in 1998, in 1979.  Before he was appointed Director, following a variety of posts, Dudley served as president and chief executive officer of a BP subsidiary from 2003 until 2008.  In exchange for his purported trust, loyalty, and fidelity to BP, Dudley received a salary, performance bonus, non-cash benefits and other emoluments in the amount of £2,179,000 in 2009.  He is a citizen of Texas.

19.     Defendant Byron E. Grote is Chief Financial Officer and a member of the Board of Directors.  Grote joined BP in 1987 following the acquisition of The Standard Oil Company of Ohio, where he had worked since 1979.  He was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002.  In exchange for his purported trust, loyalty, and fidelity to BP, Grote received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £3,090,000 in 2008 and £3,458,000 in 2009.  He is a citizen of the United Kingdom.

20.     Defendant Andy G. Inglis is an Executive Director and Chief Executive of Exploration and Production.  He has worked for BP in various capacities since 1980 and has held his current positions since 2007.  In exchange for his purported trust, loyalty, and fidelity to BP, Inglis received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £2,055,000 in 2008 and £2,217,000 in 2009.  He is a citizen of the United Kingdom.

21.     Defendant Carl-Henric Svanberg is the Chairman of the Board of Directors.  He was appointed a Non-Executive Director of BP in September 2009 and became Chairman in January 2010.  Svanberg also heads the Chairman's Committee and is a member of BP's Nomination Committee.  In exchange for his purported trust, loyalty, and fidelity to BP, Svanberg was paid £30,000 in 2009.  Svanberg is a citizen of Sweden.

22.     Defendant Paul M. Anderson is a Non-Executive member of the Board of Directors.  He joined the Board in February 2010 and is a member of the Chairman's Committee and the Safety, Ethics and Environment Assurance Committee.  He is a citizen of Texas.

23.     Defendant Antony Burgmans joined BP's Board of Directors in 2004.  He is a member of the Chairman's, Remuneration, and Safety, Ethics and Environment Assurance Committees.  In exchange for his purported trust, loyalty, and fidelity to BP, Burgmans was paid £90,000 in 2008 and £93,000 in 2009.  He is a citizen of the Netherlands.

24.     Defendant Cynthia B. Carroll is a member of BP's Board of Directors.  Carroll has served on the Board since 2007 and is a member of the Chairman's and Safety, Ethics and Environment Assurance Committees.  In exchange for her purported trust, loyalty, and fidelity to BP, Carroll was paid £93,000 in 2008 and £90,000 in 2009.  She is a citizen of Texas.

25.     Defendant Sir William M. Castell has been a member of BP's Board of Directors since 2006.  Castell is a member of the Chairman's and the Nomination Committees and is

Chairman of the Safety, Ethics and Environment Assurance Committee.  In exchange for his purported trust, loyalty, and fidelity to BP, Castell was paid £108,000 in 2008 and £115,000 in 2009.  He is a citizen of the United Kingdom.

26.     Defendant George David is member of BP's Board of Directors.  He joined the Board in 2008 and is a member of the Chairman's, Audit and Remuneration Committees.  In exchange for his purported trust, loyalty, and fidelity to BP, David was paid £100,000 in 2008 and £118,000 in 2009.  He is a citizen of Connecticut.

27.     Defendant Ian Davis is a member of BP's Board of Directors.  He joined in the Board in April 2010 and is a member of the Chairman's, Remuneration, and Audit Committees.  He is a citizen of the United Kingdom.

28.     Defendant Douglas J. Flint has served as a Non-Executive Director on BP's Board since 2005.  He is a member of the Chairman's and Audit Committees.  In exchange for his purported trust, loyalty, and fidelity to BP, Flint was paid £90,000 in 2008 and £85,000 in 2009.  He is a citizen of the United Kingdom.

29.     Defendant DeAnne S. Julius has served as a Non-Executive Director of BP since 2001.  She is a member of the Chairman's and Nomination Committees and is Chairman of the Remuneration Committee.  In exchange for her purported trust, loyalty, and fidelity to BP, Julius was paid £110,000 in 2008 and £105,000 in 2009.  She is a citizen of the United Kingdom.

30.     Defendant H. Lamar McKay is Chairman and President of BP America, Inc.  In 1980, McKay started with Amoco, which was acquired by BP in 1998, occupying a variety of positions until being appointed to his current roles in 2009.  He is a citizen of Texas.  McKay is referred to as the "Officer Defendant".

31.     The defendants set forth in paragraph 16-29 above are referred to as the "Director Defendants"

32.     The defendants set forth in paragraphs 16-30 (consisting of all Director Defendants and the Officer Defendant) are referred to as the "BP Defendants."

33.     The BP Defendants have fiduciary duties to the Company.  These include the common-law obligations of trust, loyalty, good faith, oversight, and due care.   The BP Defendants were and are required to use their utmost ability to control and manage BP in a fair, just, honest and equitable manner.   The BP Defendants were entrusted to use their abilities faithfully to ensure the Company's best interests in the long term.

34.     In addition, the BP Defendants had duties under section 172 of the British Companies Act of 2006 as follows:

> (1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to—
> (a)  the likely consequences of any decision in the long term,
> (b)  the interests of the company's employees,
> (c)  the need to foster the company's business relationships with suppliers, customers and others,
> (d)  the impact of the company's operations on the community and the environment,
> (e)  the desirability of the company maintaining a reputation for high standards of business conduct, and
> (f)  the need to act fairly as between members of the company.

35.     Defendant Transocean Ltd. is a leading international provider of offshore contract drilling services for oil and gas wells.  Transocean Ltd. is organized and existing under the laws of Switzerland with its principal place of business in Vernier, Switzerland.  Transocean Ltd. does business in Louisiana and within this District.

36.     Defendant Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.  It is organized and existing under the laws of the State of Delaware with its principal place of

business in Houston, Texas.  Transocean Deepwater, Inc. does business in Louisiana and within this District.

37.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd.  It is organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas.  Transocean Offshore Deepwater Drilling, Inc. does business in Louisiana and within this District.

38.     Transocean Ltd., Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc. are collectively referred to herein as "Transocean."  As of February 2, 2010, Transocean owned, had partial ownership interests in or operated 138 mobile offshore drilling units.  Transocean owns and operates the Rig, which it leases to BP.  At the time of the explosion, Transocean and BP were both in control of the Rig, with BP's employees providing instructions as to where and how to drill.

39.     Defendant Cameron International Corporation ("Cameron") is a leading provider of flow equipment products, systems and services to worldwide oil, gas and process industries. Cameron manufactured the blowout preventer on the Rig that failed to function correctly.  After the Rig's explosion and leak, Cameron immediately filed an insurance claim and received over $400 million in proceeds from its insurance carriers.  Cameron is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas.  Cameron does business in Louisiana and within this District.

40.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a leading provider of oilfield technology, including fluid management and technologies to assist in the drilling and construction of oil and gas wells.  Halliburton was a subcontractor to the Rig, providing services to cement the well head to the sea floor, as supervised by BP employees under the direction and

control of the BP Defendants.  Halliburton is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas.  Halliburton does business in Louisiana and within this District.

41.     Defendants "A, B, and C" are insurance companies which provided policies of insurance to Transocean covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

42.     Defendants "L, M, and N" are insurance companies which provided policies of insurance to Cameron covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

43.     Defendants "X, Y, and Z" are insurance companies which provided policies of insurance to Halliburton covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

## JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000.

45.     The Court has personal jurisdiction over each of the Defendants because each either does business in Louisiana or has sufficient minimum contacts with Louisiana to justify this State's exercise of personal jurisdiction over him consistent with the laws of Louisiana and the United States Constitution.

46.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred here, and Defendants have

received substantial compensation and other transfers of money in this District by doing business here and engaging in activities having an effect here.

## FACTUAL ALLEGATIONS

### Background:  The BP Defendants Disregard Risks Prior to 2009

47.     In recent years, the BP Defendants have sought to change the Company's image from just another oil company into one of "Beyond Petroleum"—i.e., a company that is environmentally conscious and wants to develop alternative energy sources like solar and wind power.

48.     However, in devising clever new ways to brand the Company, the BP Defendants recklessly let the crucial values of maintenance and safety fall into deep desuetude.  Safety and maintenance problems were endemic throughout the Company, including at the Rig.  Moreover, additional safety mechanisms, technologies, and precautions were known and available to all Defendants, but Defendants chose not to employ them on the Rig.

49.     In 2005, an explosion and fire ripped through a tower at a BP refinery in Texas City, Texas, killing 15 people, injuring 170 others, and costing the Company over $1 billion to remediate.  Investigators determined that BP had ignored its own protocols on operating the tower, which was filled with gasoline, and that a warning system had been disabled.  The Company was forced to plead guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency.  In addition, BP officers signed a settlement with federal safety inspectors vowing to institute improvements, but in 2009 the federal Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine—the largest in its history—on the Company for failing to correct the safety violations at the

Texas City plant.  OSHA also declared that BP had a "serious systematic safety problem" across the Company.

50.     In 2006, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.  The Company had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was hopelessly corroded.  The Company was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines.  Moreover, a Congressional committee later determined that BP had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations.  The incident led to the resignation under fire of The Lord John Browne of Madingley, BP's aristocrat-former CEO.

51.     The risks of offshore drilling were well known to the BP Defendants, and are especially high in the Gulf, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea.  Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to serious accidents.  The Rig itself was badly burned by an accidental fire in 2005, and the accidental opening of a valve in May 2008 flooded the Rig with seawater, causing very substantial damage.

52.     When current CEO Defendant Anthony Hayward took office in 2007, he promised to change the Company's culture, with a renewed commitment to safety.  The record shows this promise was an empty one, as Hayward and the other BP Defendants have led the Company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures heedless of safety and environmental concerns.

53.     Indeed, in 2009, when the federal Minerals Management Service ("MMS") proposed a rule that would have required companies to have their safety and environmental

14

management programs audited once every three years, the BP Defendants lodged a formal objection on behalf of BP.  That same agency is also investigating charges by a whistle-blower that the Company was caused to discard important records from its Atlantis Gulf platform.

54.     Moreover, the BP Defendants actively opposed MMS's rules requiring oil rig lessees and operators to develop and audit their own safety and emergency management plans, insisting, against all evidence, that voluntary compliance would suffice.  In 2009, the BP Defendants caused the Company to spend $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and the BP Defendants' knowledge of the high risks involved in such drilling.

55.     The BP Defendants' stance has had its predictable consequences in the appalling safety record of the Company in 2009 alone.  In the months before the Rig sank in a ball of fire, the Company experienced four close calls on pipelines and facilities it operates in Alaska, as detailed in a January 14, 2010, letter written by two U.S. Congressmen, Rep. Bart Stupak and Rep. Henry Waxman to the president of BP's Alaskan operations.  These congressmen's letter specifically noted that the Company's efforts to cut costs could imperil safety at BP facilities. The letter, which was accompanied by a congressional document request and was referred to BP's legal department and the Safety, Ethics and Environment Assurance Committee of its Board of Directors, raised an unmistakable "red flag" that went ignored by the BP Defendants.

56.     Indeed, in the year before the Deepwater Disaster, BP had repeatedly and aggressively cut costs.  In fact, a reorganization stripped 5,000 jobs from its payroll, saving BP more than $4 billion in operating costs.  .

57.     The congressmen had been investigating BP since the Prudhoe Bay incident in 2006.   In their letter, the congressmen noted "several significant events" in BP's Alaskan operations in the previous 15 months:

- September 29, 2008:  An 8-inch high pressure gas line at the Y-Pad location "separated," sending 3 pieces of pipe to the tundra.  Two segments of the pipe measuring 14 feet and 28 feet in length landed 900 feet from the pipeline.  Roughly 30 minutes later, a second and unrelated incident occurred on the S-Pad, causing a gas release.

- January 15, 2009:  A disc cleaning "pig" became lodged and lost in a 34-inch Oil Transit Line during de-oiling, allowing gas to pass around the pig and travel through Skid 50 to Pump Station 1, causing significant venting of gas to the atmosphere and the complete, temporary shutdown of the TAPS.

- October 10, 2009:   At the Central Compressor Plant, low pressure flare staging valves stuck closed, causing gas to travel to the backup low pressure flare valves, which activated and caused gas to vent improperly into the atmosphere.  This incident could have caused an explosion.  In a briefing, you reported to Committee staff that the pilot on the backup flare was not lit and that cameras, while on, were not pointed at the flare location, which prevented BP staff from knowing the pilot was out.

- November 29, 2009:  An 18-inch pipe near the Lisburne Production Center that was carrying a mixture of crude oil, produced water, and natural gas ruptured, spraying its contents over an estimated 8,400 square feet area.

In addition to these four events, BPXA has experienced a number of personnel incidents involving serious injury or death, including two within three weeks of each other in which individuals were crushed by their own vehicles.  A vehicle incident at Prudhoe Bay's North Gas Injection Pad on November 18, 2009 resulted in the death of a BP contract employee.

58.     The letter continued:  "*At the same time these events are occurring, Committee staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations.*"  (Emphasis added.)

59.     The incidents described in the congressmen's letter did not amount to disasters on the scale of the Rig's explosion, but the risks they posed were equally grave, as reported in a

May 4, 2010, article entitled "Congressmen Raised Concerns About BP Safety Before Gulf Oil

Spill" featured on the weblog *ProPublica: Journalism in the Public Interest*:[1]

> In the most dangerous of the incidents last year in Alaska, safety backstops also failed.  On Oct. 10, 2009, a staging valve stuck closed at a large central compressor station in Prudhoe Bay where gas is captured for re-injection back underground.  According to the congressional letter, the blockage caused gas to back up on another series of valves.  A backup flare meant to burn off that collection of gas was not lit at the time, and cameras, installed so BP's staff could monitor the flare's functions in real time, were not pointed in the right direction. There was no explosion; the gas vented out before anything could ignite it.

> Robert Bea, a professor at University of California Berkeley's department of civil and environmental engineering who has worked for both Shell and BP on Alaska's North Slope, said the situation at the compressor station sounded like a ticking bomb.

> "It's hard to describe these explosions in terms that people can understand," he said. "It would rival the biggest ones that we have ever had in the history of the oil and gas industry."

> Bea said a blast zone could reach 300 feet and leave a crater 90 feet wide. He likened the potential scenario to a gas valve error that led to the massive explosion of an offshore drilling platform called Piper Alpha in the North Sea in 1988, in which 167 workers were killed.

> In a Sept. 29, 2008, incident cited in the congressional memo, a high-pressure gas line blew apart without igniting, sending a 28-foot long piece of metal 900 feet through the air and spewing gas.

> "Let's just call them lucky," Bea said. "Even the steel bouncing around can ignite sparks to erupt the gas."

> On Jan. 15, 2009, a cleaning pig -- a bullet-shaped device that runs diagnostics inside the pipeline -- got stuck and let large amounts of gas leak into a pump station.

> And on Nov. 29, 2009, an 18-inch pipe carrying a mixture of oil, natural gas and waste water ruptured, spraying its flammable contents.

> BP has a recent history of disasters stemming from incomplete maintenance and faulty equipment, including the 2005 blast at a refinery in Texas City, Texas, where 15 workers died after a fuel tower was powered up without following protocol. Then there was the 2006 Alaskan pipeline spill, which occurred four years after BP had been warned about corroded pipelines. The company pleaded guilty to felony counts in the first incident and a misdemeanor charge in the second, tallying fines in excess of $62 million.

> The Committee on Energy and Commerce, now chaired by Waxman, has oversight authority for the Trans-Alaska pipeline. In congressional hearings after the 2006 Prudhoe Bay spill, BP management was accused of making "draconian"

---

[1]     *See* http://www.propublica.org/article/congressmen-raised-concerns-about-bp-safety-in-months-before-gulf-spill (last visited May 10, 2010).

budget cuts that affected safety and health, including limiting the use of a corrosion inhibitor inside the pipeline, a step that could have prevented the deterioration that led to the 2006 spill. In his most recent letter, Waxman repeats the concern that the company is cutting corners.

**The Rig:  Safety and Maintenance at their Lowest**

60.     The BP Defendants' reckless inattention to safety and maintenance issues reached its nadir at the Rig.

61.     At the time of the Deepwater Disaster, the Rig was not producing any oil.  The Rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well.   In this final phase, Halliburton workers on the Rig, under the supervision and control of BP's employees, were attempting to create a cement seal to plug off the wellhead.  BP's employees under the supervision and control of one or more of the BP Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

62.     Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well.  Indeed, the BP Defendants knew that the work being performed at the Rig was especially risky.  In 2007, MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Rig was doing when it exploded.  This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

63.     Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with alarming regularity, and most frequently of all in the Gulf.  Cementing was a factor in 18 of 39 well blowouts in the Gulf between 1992 and 2006.

64.     Indeed, Halliburton bore responsibility for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged.  MMS is investigating that incident, and an MMS official has testified that a poor cement job likely caused the blowout.  This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

65.     Moreover, a blowout preventer manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000.  In that incident, BP issued a notice of default to Transocean concerning the functioning of one of Transocean's oil rigs, in which the blowout preventer was the subject of concern.  Defendant Hayward acknowledged the existence of this dispute in public comments on May 4, 2010.  This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

66.     In addition, the BP Defendants were aware of an August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.  During that incident, which bears a strong resemblance to the Deepwater Disaster, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.  This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

67.     The threat of blowouts increases as drilling depth increases.  Deepwater Horizon was drilling in 5,000 feet of water, to a total depth in excess of 20,000 feet.  The BP Defendants were well aware of the high risk of blowouts from such deep drilling.

68.     Not only did the blowout preventer on the Rig fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.

69.     Worse, the BP Defendants failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

70.     First, the BP Defendants consciously elected not to install an acoustically-activated remote-control shut-off valve, costing only $500,000,[2] to the well.   Indeed, such acoustic switches are mandated in countries like Brazil and Norway, and are employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of the BP Defendants themselves as well as their counterparts at other companies.

71.     Second, the BP Defendants chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor.   Much like blowout preventers, devices that are meant to seal leaks, this valve could have served as a cutoff of last resort in explosions.

72.     The BP Defendants ignored these precautions despite being well aware of the increased risk, from deep-sea drilling, of a failure of the primary blowout safety mechanism, the blowout preventer.   BP's Safety, Ethics and Environment Assurance Committee knew this information, but took no steps to act on it.

73.     A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such great depths.   Only three of 14 rigs studied had blowout preventers able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.   "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said.

_____

[2]     By contrast, the replacement cost of the Rig as a whole is $560 million.  BP has so far incurred $350 million and is incurring at least an additional $6 million per day to try to contain the spill, and the total expenses of containment and clean-up could reach $10 billion.

Moreover, the study singled out defendant Cameron, the manufacturer of the Rig's blowout preventer, for relying on faulty calculations to determine the necessary strength for its blowout preventer equipment to function properly at greater depths.    BP's Safety, Ethics and Environment Assurance Committee knew this information, but took no steps to act on it.

74.    Over ten years ago MMS sent out an industry-wide safety alert ordering companies drilling in deep water in the outer continental shelf to have effective backup systems. The March 2000 notice stated: "The MMS considers a backup [blowout preventer] actuation system to be an essential component of a deepwater drilling system, and therefore expects OCS operators to have reliable back-up systems for actuating the [blowout preventer]."    MMS, however, left it up to the individual companies to decide what kind of backup system to use.  The BP Defendants chose not have a backup system for activating the blow-out preventer at the Rig.

75.    The operation of the Rig, and particularly the installation of the final cement casing at the well-head prior to the conclusion of the exploratory phase of the well, was also carried out by Halliburton and the BP Defendants with extreme recklessness.  As the *New York Times* reported (May 3, 2010):

> More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well — a possible factor that could have contributed to the explosion.
>
> *    *    *    *
>
> The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil.
>
> Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.
>
> The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal.
>
> The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said. But idling a

rig to address such a problem can cost huge sums. . . . [L]awyers said that
supervisors either missed or ignored the signals and proceeded with the job.

When workers released the last valves that were holding back the natural
gas that had built up inside the well, the gas shot up the pipe and sprayed into the
drilling rig, igniting the fireball that caused the deaths of 11 workers, injured
others and sank the rig . . . .

76.     Employees working on the Rig experienced recurring problems with pockets of

highly flammable natural gas forcing its way up the drilling pipes.  BP did not view these

incidents as problematic, but instead stated that the gas was likely to only create a "negligible"

risk.  The government, however, cautioned the Company that gas buildup was a genuine concern

and that BP should take note and "exercise caution."  In the weeks leading up to the Deepwater

Disaster, so much natural gas rose to the surface that an emergency announcement called for a

stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters.

Smaller belches of gas also slowed work at the Rig on other occasions too.  Despite the dangers

posed by the extreme gas build up, Halliburton nonetheless chose to employ a risky technique of

creating its cement by mixing nitrogen gas into it to create a mousse-like compound.  Employees

on the Rig have suggested that men were perhaps motivated to finish early in order to earn

bonuses for finishing the job ahead of schedule.

77.     The *New York Times* has also reported, citing lawyers for environmental groups,

oil rig workers, and commercial fishermen, that:  "At least one worker who was on the oil rig at

the time of the explosion on April 20, and who handled company records for BP, said the rig had

been drilling deeper than 22,000 feet, ***even though the company's federal permit allowed it to***

***go only 18,000 to 20,000 feet deep . . .*** " (emphasis added).

**The Explosion and Sinking of the Rig and the BP Defendants' Lackluster Response**

78.     The explosion occurred at approximately 10 p.m. on April 20, 2010.  The Rig caught fire and sank two days later, at approximately 10 a.m. on April 22, 2010.  Eleven workers were killed, and three seriously injured.

79.     The Rig was connected to the wellhead on the seal floor by a 5,000-foot pipe called a riser.  As the Rig sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser bent into a crooked shape underwater, and now snakes along the ocean floor and in the deepest waters slightly above it.  Oil is leaking from the open end of the riser and from three places along its length, including one location almost at the wellhead.

80.     The BP Defendants' initial response to the Deepwater Disaster was lackluster and only intensified the damage.

81.     After the explosion, the BP Defendants attempted to downplay and conceal the severity of the oil spill.  An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels (200,000 gallons) per day.  Moreover, the BP Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

82.     At the time of this filing, the BP Defendants have not capped the wellhead, and the flow of oil continues unabated into the Gulf waters.  The ever-expanding oil slick made landfall on the fragile Louisiana coastline on Friday morning, April 30, 2010, and balls of tar began washing up on an island three miles off the coast of Alabama on Saturday, May 8, 2010. The oil spill will continue to affect more and more of the Gulf coastline as it is driven landward

by currents and winds.  The BP Defendants' attempts over the weekend of May 8-9, 2010, to contain a majority of the oil continuing to spill by using a specially-engineered "dome" over the wellhead failed and were aborted.  In light of the failure, BP has resumed injecting dispersants into the gusher a mile below the surface, as the BP Defendants puzzle over other ideas to plug the well or siphon off the spewing oil.  These include a smaller containment box, called a "top hat," and injecting debris (including shredded rubber) into the well as a stopper, a process known as a "junk shot."  It is far from clear, however, that such renewed efforts will be successful, and any relief will take weeks or months to complete while oil continues to spew forth from the well.

83.    Indeed, while the news media have compared this spill to the 1989 Exxon *Valdez* disaster, one crucial difference is that the *Valdez* was an oil tanker with a limited supply of oil. Experts have estimated that the volume of the continuous gush of oil into the Gulf will eclipse that of the *Valdez* spill within 50 days.  In contrast, current relief efforts will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

84.    Worse, the floating booms that the Company has been caused to set in place, to block the oil from reaching the coastline, may be too low and/or be placed too far out to sea to be useful.  Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers along with it.  In the first few days of May, the Gulf experienced seven- to ten-foot swells, making the booms all but useless.

85.    Moreover, BP's latest attempt to contain the Deepwater Disaster was unsuccessful and further demonstrated BP's lack of preparedness to deal with this disaster.  On or around May 8, 2010, BP lowered a 40-foot-tall steel chamber over the oil leak about a mile below the surface, hoping to capture the leaking oil and pump it to a nearby ship.  The steel chamber took

approximately 2 weeks to build, and an additional 3 days to cart it out 50 miles into the Gulf. The containment box plan – which was never before tried at such depths – was meant to siphon up to 85 percent of the leaking oil to a tanker at the surface.  When the steel chamber was slowly lowered to the well, the plan failed because ice-like hydrates, a slushy mixture of gas and water, clogged the opening in the top of the peaked box.  The Company was forced to abandon the effort and begin to study how to stop the ice forming before it makes another attempt using this method.

86.     While BP struggles with its containment initiative, 5,000 barrels of crude oil are leaking into the Gulf each day.  On May 10, 2010, BP Chief Operating Officer Doug Suttles admitted that Company is woefully unprepared to mitigate the damage of the Deepwater Disaster due to the Rig's current location.  Suttles stated "There's a lot of techniques available to us.  The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

87.     BP — which is responsible for the cleanup related to the Deepwater Disaster — also stated on May 10, 2010 that the Deepwater Disaster has cost it $350 million so far for immediate response, containment efforts, commitments to the Gulf Coast states, and settlements and federal costs.  The Company did not dare speculate on the ultimate cost, which most analysts expect to run into tens of billions of dollars

88.     BP's containment system, now set aside on the seabed, was the Company's number one plan to slow the spread of oil while it drills a relief well to plug the leak with an injection of mud and cement.  BP indicated that it may try to plug the well by injecting pieces of rubber and installing a new blowout preventer to shut off the flow.  The Company is also preparing a second, smaller containment dome to be lowered over the main leak.  The Company claims it is designed to resist the formation of large hydrate volumes that plagued the first

containment box effort.  BP will also try to contain the leak using a "top kill" option after working to repair the well's blowout preventer.

89.     As the oil continues to make landfall along the Gulf Coast, it will cause severe damages to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, and Florida, destroying the habitats where countless species of fish and marine life breed, spawn, and mature.  The timing of this disaster makes it even more damaging, as May is spawning season for much seal life and migration time for the young of many species of shrimp and various pelagic fish species.  Such devastation of so many species will severely damage and perhaps even destroy the livelihoods of many commercial fishing interests in the area.  The National Oceanographic and Atmospheric Administration may soon declare a 6,800-square-mile area a "fisheries disaster."

90.     In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output.  Nearly a third of all marine recreational fishing trips, including those part of the $1 billion-per-year sport fishing industry, take place on Gulf waters.  In 2008, the 3.2 million recreational fishermen in the Gulf took 24 million fishing trips.  All of these activities and business are now in serious jeopardy.

**Further Evidence Emerges of the BP Defendants' Misconduct as to Safety Issues**

91.     In the aftermath of the Deepwater Disaster, Congress, as well as MMS, has commenced separate investigations of allegations that BP failed to keep proper documentation about how to perform an emergency shutdown of the Atlantis, another Gulf oil platform similar to the Rig.

92.     As reported in the *Guardian* ("Whistleblower accuse BP over rig documents:  A contract worker at BP raised safety concerns after accusing it of failing to keep key documents for its Atlantis rig," Apr. 27, 2010):

The Guardian has learned a separate MMS investigation into the Atlantis rig allegations is being launched. MMS said it would complete its report by the end of next month. Atlantis, 190 miles south of New Orleans, is the world's largest platform of its kind and began operating in 2007 in the Gulf of Mexico at one of the deepest depths in the world.

A whistleblower employed by a contractor working for BP leaked internal emails from staffers dated August 2008 which appear to reveal concerns that BP may not have been keeping a complete accurate record of drawings of the components used to build the Atlantis platform.

Final "as-built" drawings show how generic parts are modified when they are assembled. They can be crucial to assess how such a complex structure operates in practice. It is federal law for rig operators to keep complete, up-to-date "as-built" drawings. If BP assumed the drawings were accurate and up-to-date, "this could lead to catastrophic operator errors", a BP executive involved in the project warned colleagues, according to one email.

At the end of February, the powerful House committee on natural resources wrote to MMS demanding it investigate the claims. The agency, which declined to provide further details to the Guardian, promised to launch the inquiry soon afterwards.

The Deepwater Horizon accident has reinforced environmental concerns in the U.S. about offshore oil drilling and will put pressure on the MMS to ensure standards are fully met by all operators, particularly in the deep waters of the Gulf of Mexico.

U.S. environmental consumer campaign group Food and Water Watch also passed to the Guardian what appears to be an official reply to the whistleblower from BP's office of the ombudsman, which was set up to investigate internal safety concerns following the Texas refinery explosion of 2005. Dated 13 April 2010, deputy ombudsman Billie Pirner Garde is quoted responding to the whistleblower's concerns over BP's "Project Execution Plan" over Atlantis, centering on the alleged lack of documentation. "Your concerns about the project not following the terms of its own Project Execution Plan were substantiated, and addressed by a BP Management of Change document," he is quoted as writing.

**The Consequences to BP:  Calamity**

93.     BP alone has already incurred $350 million in costs and is incurring costs of $6 million per day to attempt to stop the oil leak and remediate the effects of the Deepwater Disaster.  The total estimated impact to BP is in the tens of billions of dollars.

94.     Pursuant to the Oil Pollution Act of 1990, the federal government has assigned responsibility for the cleanup to BP.  The Act provides for the recovery, among other things, of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

95.     Although liability under federal law is capped under the Act at $75 million, legislation is moving through Congress as this complaint is finalized that would raise the liability cap $10 billion and make that change retroactive—i.e., fully applicable to BP with respect to the Rig's leak.

96.     Moreover, even before legislative efforts were initiated to raise the cap, Defendant Hayward—in an implicit admission of liability—announced that BP would voluntarily pay in excess of the liability cap imposed by the Act to remediate the problem.

97.     BP is also exposed to statutory liability pursuant to the Louisiana Oil Spill Prevention and Response Act ("LOSPRA").  Pursuant to LOSPRA, the party responsible for an oil spill is liable for up to $350 million in damages arising from the discharge, and must pay all pollution removal costs and damages, regardless of any defenses it may assert.

98.     In addition to statutory liability, dozens of lawsuits, including class actions, have been filed, which will expose BP to hundreds of millions, if not billions, of dollars in additional

liability to private parties, including families of the workers, environmental groups, commercial fishermen, and property owners along the Louisiana, Mississippi, Alabama, and Florida coasts.

99.     Perhaps the greatest damage from Defendants' misconduct will be to BP's reputation and good will.

100.     Indeed, as the *New York Times* reported (Apr. 29, 2010):

> But regardless of the out-of-pocket costs, the long-term damage to BP's reputation — and possibly, its future prospects for drilling in the Gulf of Mexico — is likely to be far higher, according to industry analysts.
>
> The magnitude of the Deepwater Horizon disaster seems to be finally sinking in with investors. BP's stock plunged more than 8 percent Thursday in American trading in an otherwise strong day for stocks. Since the accident, the American depositary receipts of the company have fallen about 13 percent, closing Thursday at $52.56.
>
> For Tony Hayward, who has led BP for the last three years, the accident threatens to overshadow all of the efforts he has made to burnish the tattered reputation of the company after a refinery explosion in Texas in 2005 and a pipeline leak in Alaska in 2006.
>
> As Mr. Hayward said to fellow executives in his London office recently, "What the hell did we do to deserve this?"
>
> A BP spokesman said no executives were available for an interview Thursday. But in response to a written question, Mr. Hayward said, "Reputationally, and in every other way, we will be judged by the quality, intensity, speed and efficacy of our response."

## <u>DERIVATIVE ALLEGATIONS</u>

101.     Plaintiff brings this action derivatively in the right and for the benefit of BP to redress injuries suffered, and to be suffered, by BP as a direct result of the BP Defendants' breaches of fiduciary duties by virtue of the wrongs alleged herein and the misconduct of the other defendants.  The claims herein arise from an actual or proposed act or omission involving negligence, default, breach of duty, and/or breach of trust by directors and/or former directors of BP, as well as the misconduct of other defendants.  BP is named as a nominal defendant solely in a derivative capacity.  Plaintiff seeks to assert solely causes of action vested in BP and seek relief

solely on behalf of BP.  Plaintiff has no individual standing to pursue the claims herein as direct claims against any of the Defendants.

102.   Plaintiff will adequately and fairly represent the interests of BP in enforcing and prosecuting its rights.

103.   Plaintiff has been an owner of BP common stock, at all relevant times and continues to own such stock at this time.

104.   Prosecution of this action, independent of the BP Board, is in the best interests of the Company.

105.   This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company.  Plaintiff has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as representative parties in this action except such fees or other payments, including attorneys' fees, as the Court expressly approves to be paid to Plaintiff or on Plaintiff's behalf.

106.   To this end, Plaintiff has taken steps to commence this action and have retained counsel experienced in derivative litigation and corporate governance litigation.  To the extent Court permission is required to continue this action, such permission is hereby sought, and this Complaint constitutes Plaintiff's prima facie case for obtaining such permission.

107.   The claims herein concern acts and omissions that were not authorized by BP but, rather, occurred as a consequence of the unauthorized and unratified failure of the BP Defendants to execute their fiduciary duties to the Company as well as the unauthorized and unratified acts of third parties also named as defendants.

108.    As of the date hereof, BP has not made a decision whether to pursue the claims herein, nor would any decision not to pursue the claims be entitled to deference.  BP cannot act except through its Board of Directors, and the Board, all of whose members have been named as defendants herein, could not and would not objectively determine whether bringing these claims were in the best interests of the Company and its shareholders.

109.    First, the acts and decisions of the BP Board—as catalogued herein—constituted a breach of the Director Defendants' fiduciary duties of care, oversight, good faith, candor, and loyalty.  These decisions were not, and could not have been, the product of the Board's good faith, informed business judgment.  As such, and for this separate and independent ground alone, demand on the Board to bring these claims on the Company's behalf would be a futile gesture.

110.    Second, the Director Defendants have conclusively demonstrated their inability or unwillingness to pay due care to safety and maintenance issues at BP despite prior legal proceedings seeking to hold them to account for their failures in that regard.

111.    The failures at all levels of the Company leading to the Texas City Explosion, as well as the massive oil spill and complete pipeline shutdown at Prudhoe Bay, Alaska in 2006, together with other improprieties, were the specific subject of a shareholder derivative lawsuit brought against BP's Board of Directors and various officers in the 2006.  *See In re BP P.L.C. Derivative Litigation*, No. 3AN-06-11929CI (Alaska Super. Ct. filed Oct. 5, 2006) (the "Alaska Derivative Action").

112.    In the Alaska Derivative Action, the plaintiff, a holder of American Depositary Receipts of BP, sought recovery on behalf of the Company against its directors and officers, including many of the BP Defendants named herein.  The plaintiff asserted that the defendants had breached their fiduciary duties to BP by, among other things, causing the Company to

violate the laws of the U.S. and several states relating to environmental regulation and worker and workplace safety.  In particular, the plaintiff alleged that the defendants resorted to improper and illegal activities to cut costs and temporarily boost BP's reported results—including refusing to make expenditures for necessary plant and equipment inspections, worker training, emergency response plans and procedures, and the maintenance and replacement of equipment.  This pattern of improper conduct led inevitably to both the 2005 explosion in Texas City, Texas, and the 2006 Prudhoe Bay oil leak and their attendant curtailment of production, employee injuries, civil and criminal investigations, government fines (including the record $87 million fine by OSHA) and reputational damage.

113.    The defendants in the Alaska Derivative Action first sought to remove it to the United States District Court for the District of Alaska on the grounds that the plaintiff had "fraudulently" joined various defendants in an attempt to defeat federal jurisdiction.  The plaintiff moved to remand the action, but before that motion could be decided, the defendants consented to a remand.  The defendants thereupon filed motions to dismiss based on lack of standing, lack of personal jurisdiction, and *forum non conveniens*, all of which grounds were denied by the Alaska Superior Court in an extensive written opinion on May 18, 2007.  The parties promptly entered into a settlement agreement.

114.    The settlement agreement in the Alaska Derivative Action required the defendants to agree to certain corporate governance changes at BP designed in part to prevent a recurrence of the disregard of safety and maintenance problems at the Company.  Such changes including making safety and environmental performance a component in determining executive compensation and requiring non-executive Board members to participate in a program of visits to the Company's operating sites to assist in their understanding of the importance of safety and

environmental concerns.   While purporting to implement the relevant reforms, the BP Defendants have merely gone through the motions, while ignoring the substance and import of the Alaska Derivative Action, which was to prevent further disasters like Prudhoe Bay and Texas City, Texas.   Under the BP Defendants, as confirmed by the Rig's incident, the Company has not experienced one iota of improvement in its workplace and environmental safety and still suffers from the same shoddy level of investment and resources in equipment maintenance and inspections, worker training, emergency response plans and procedures, and compliance with law.   The Company's drilling to 22,000 feet in violation of its drilling permits merely confirms this point.   Thus, the Director Defendants, who cannot be trusted to carry out improvements and reforms called for in the court-approved settlement of a previous full-blown shareholder derivative lawsuit, *a fortiori* cannot be trusted to decide whether to bring the current claims in the first instance.

115.   Third, the Director Defendants face a substantial threat of liability for their breaches of fiduciary duty set forth herein.   Indeed, the various Committees of the Board were specifically tasked with control and oversight over the very conduct that went so fatally awry at BP.   Each of the Director Defendants sat on at least one—and in most cases, several—of the Board's Committees during the relevant period and thus had direct responsibility for ensuring various aspects of the Company's operations.   Each of the Committees was charged with making regular reports to the Board of Directors.

116.   The members of BP's Safety, Ethics and Environment Assurance Committee were charged, among other things, with:  (a) reviewing "the processes adopted by the executive management to identify and mitigate significant non-financial risks and receive assurance that they are appropriate in design and effective in implementation"; (b) "monitoring and obtaining

assurance that the management of mitigation of significant BP risks of a non-financial nature is appropriately addressed"; (c) "reviewing material to be placed before shareholders which address BP's environmental, safety and ethical performance and making recommendations to the board about their adoption and publication"; (d) "reviewing BP's internal control systems as they relate to non-financial risk"; and (e) "reviewing reports on the group's compliance with its code of conduct and on the employee concerns programme".  The members of the Safety, Ethics and Environment Assurance Committee are defendants Castell (chair), Anderson, Burgmans, and Carroll.  By virtue of the fact that each member of this committee was charged with overseeing the Company's safety and environmental law compliance, ethics, and risk mitigation, among other things, defendants Castell, Anderson, Burgmans, and Carroll are personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly determine whether to bring these claims.

117.    The members of BP's Audit Committee were charged, among other things, with: (a) "reviewing the effectiveness of BP's . . . internal control and risk management"; (b) "monitoring and obtaining assurance the management and mitigation of significant risks of a financial nature facing BP are appropriately addressed"; and (c) "monitoring and reviewing the effectiveness of BP's internal audit function".  The members of the Audit Committee are defendants Flint (chair), David, and Davis.  By virtue of the fact that each member of this committee was charged with ensuring that BP's accounting and reporting practices ensured that all potential liability was accurately calculated and reported to the Company's investors and it was not, defendants Flint, David, and Davis personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly determine whether to bring these claims.

118.    Fourth, the executive (or "inside") directors of BP are unable to objectively determine whether to bring these claims in all events.

119.    BP's Remuneration Committee is charged with determining the salaries, bonuses ("performance-based variable pay"), stock awards, and other remuneration of each of the "inside," executive directors of the Company.   The remuneration to be given to these executive directors—namely, defendants Hayward, Conn, Dudley, Grote, and Inglis—is purportedly based on "key safety measures (15% of bonus), staff numbers and survey results to reflect the people priorities (15%) and a set of financial and operational targets to measure performance (70%)."

120.    "Inside" directors Hayward, Conn, Dudley, Grote, and Inglis are executive officers of BP who depend for their livelihoods on their positions, careers, and remuneration from BP.   These defendants were very handsomely compensated in 2009, as reflected in the remuneration committee's annual report:

| Defendant | Salary | Bonus | Other | Total | Value of Stock Awarded |
|-----------|--------|-------|-------|-------|------------------------|
| Hayward | £1,045,000 | £2,090,000 | £  23,000 | £3,158,000 | £852,000 |
| Conn | £   690,000 | £1,104,000 | £  46.000 | £1,840,000 | £551,000 |
| Dudley | $  1,000,000 | $1,125,000 | $304,000 | $2,179,000 | n/a |
| Grote | $1,380,000 | $2,070,000 | $   8,000 | $3,458,000 | $933,000 |
| Inglis | £   690,000 | £1,311,000 | £216,000 | £2,217,000 | £483,000 |

Because their remuneration and livelihood for 2010 will be severely impacted by the safety, financial, and operational impact from the Rig's disaster that will constitute a full 85 percent of their bonus, these "inside" directors are not capable of objectively and disinterestedly deciding whether to bring these claims.

121.    Indeed, the "inside" directors are beholden to members of BP's Remuneration Committee, who are themselves conflicted from objectively considering whether to bring these claims.    The members of BP's Remuneration Committee are defendants Julius (chair), Burgmans, David, and Davis.   A majority of the Remuneration Committee (Burgmans, David, and Davis) thus consists of audit (David and Davis) and Safety, Ethics and Environment Assurance Committee members (Burgmans) who face a substantial likelihood of personal liability for these claims and cannot objectively determine whether to commence a legal action on them.   Thus, the "inside" directors Hayward, Conn, Dudley, Grote, and Inglis will have their compensation determined by directors who themselves are liable (Burgmans, David, and Davis) and accordingly are beholden to the latter, providing yet additional reasons why these "inside" directors cannot objectively determine whether to bring these claims.

122.    Fifth, BP is a defendant in literally scores of lawsuits, both in the Gulf and across the country, including class actions, seeking to hold the Company liability for billions of dollars in damages as a result of the Rig's fire and oil spill, including damages for wrongful death and bodily injury, damages to real and personal property, damages to commercial interests (including tourism, commercial fishing, and recreational fishing, wholesale seafood distribution), damages to maritime activities, and environmental damages.   This includes at least 27 separate lawsuits in this District alone.

123.    The Director Defendants cannot reasonably be expected to defend BP itself against allegations of misconduct in these actions while simultaneously pursuing these claims officers, directors, and employees of BP for the same or very substantially related misconduct. In light of the vast number of claims in these lawsuits seeking to hold BP liable, it is not possible for the Director Defendants in this case, who constitute the entire Board, to impartially consider

whether to bring these claims.  If the Company pressed forward with its rights of action against the defendants in this case, then the Company's efforts would undercut or even compromise the defense of the other lawsuits.

## CLAIMS FOR RELIEF

### Count I

### (Derivatively Against the BP Defendants for Breach of Fiduciary Duty)

124.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

125.    By reason of their fiduciary relationships, Defendants owed the Company and its shareholders the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

126.    Defendants, and each of them, violated and breached their fiduciary duties by, among other things:  (a) causing BP to violate applicable law, disregarding their duties as fiduciaries; (b) causing BP to violate core worker safety and environmental laws and exposing the Company and its shareholders to criminal liability and unnecessary costs, fines, penalties, and tort liability; (c) exposing the Company and its shareholders to massive fines, penalties, and compensatory damages awards for violations of U.S. and state environmental laws; and (d) subjecting BP to adverse publicity and loss of goodwill, greatly increased costs of capital, and impaired earnings.

127.    The BP Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful conduct.

128.    As a direct and proximate result of the BP Defendants' failure to perform their fiduciary obligations, including the failure to maintain a system of internal controls adequate to

insure the Company's compliance with all applicable laws, BP has suffered significant damages, including a drastic diminution in its reputation, good will, and the value of its assets.

129.    As a result of the misconduct alleged herein, each of the BP Defendants is liable to the Company for the payment of money damages.

## COUNT II

**(Derivatively Against the BP Defendants for Waste of Corporate Assets)**

130.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

131.    As a direct result of the wrongdoing alleged herein, the BP Defendants have unreasonably and unnecessarily caused BP to expend billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold billions of dollars, to the extreme detriment of the Company.

132.    Additional, as set forth above, the BP Defendants have awarded themselves excessively lucrative compensation which has no reasonable basis, but instead is designed only to enrich themselves in spite of their perfidious stewardship and the Company's dismal performance.

133.    As a direct and proximate result of the BP Defendants' waste of corporate assets as alleged herein, BP has sustained damages.

## COUNT III

**(Derivatively Against All Defendants for Contribution)**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The conduct of Defendants has exposed BP to significant liability.

38

136.    BP's liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts and omissions of the BP Defendants and the reckless or negligent acts and omissions of Transocean, Cameron, and Halliburton.

137.    BP is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are, or may in the future be asserted against BP by virtue of Defendants' wrongdoing.    In addition, BP is entitled to contribution and indemnification from each of "A, B, and C" Insurance Companies, "L, M, and N" Insurance Companies, and "X, Y, and Z" Insurance Companies for the proceeds of any insurance coverage paid to Transocean, Cameron, or Halliburton, respectively, in respect of the acts and omissions alleged herein.

## COUNT IV

**(Derivatively Against Transocean, Cameron, and Halliburton for Constructive Trust)**

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    To the extent Transocean, Cameron, or Halliburton have received or will received proceeds from payments on insurance claims submitted to their carriers "A, B, and C" Insurance Companies, "L, M, and N" Insurance Companies, and "X, Y, and Z" Insurance Companies, respectively, the proceeds should be held in a constructive trust for the benefit of BP in respect of the acts and omissions alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the misconduct complained of herein, together with prejudgment interest, structured in a fashion to ensure that Defendants do not participate herein or benefit hereby.

B.      Directing Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their misconduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon.

C.      Directing Defendants to take all necessary actions to comply with La. RS 6:337, its predecessor La. RS 10:9-211, and all applicable Louisiana statutes and jurisprudence, including but not limited to Louisiana's laws prohibiting unjust enrichment and conversion.

D.      Directing BP to take all necessary actions to reform and improve its corporate governance and internal procedures, including putting forward for a shareholder vote resolutions for amendments to the Company's articles of incorporation and by-laws, and taking such other actions as may be necessary to place before shareholders for a vote the following corporate governance policies:

(1)      limiting the number of inside, executive directors on the Board of Directors to two;

(2)      strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board with respect to supervision of operations;

(3)      establishing an environmental and litigation exposure oversight committee, staffed entirely by independent, non-executive directors and provided with adequate financial resources to retain independent counsel and advisors;

(4)      permitting shareholders to nominate at least three candidates for election to BP's Board of Directors;

(5)      testing and strengthening the internal audit and control functions;

(6)      controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments, including instituting a performance-based "delay and claw-back" policy whereby the payment of bonuses and other incentive-based compensation paid to Company officers is delayed for a definite period, and/or is subject to return to the Company, pending determination whether the Company operated without serious environmental or litigation exposure for the period in question;

(7)      requiring full compliance with Sarbanes Oxley;

(8)      permitting shareholders to question all executive directors of BP at the annual general meeting and establishing a more transparent process for receiving and evaluating shareholder proposals.

E.      Awarding punitive damages.

F.      Declaring that BP is entitled to contribution and indemnification from all Defendants, and imposing a constructive trust on the insurance proceeds received by

Transocean, Cameron, or Halliburton from their insurance carriers named as anonymous defendants herein.

G.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

H.     Granting such other and further relief as this Court may deem just and proper.

Dated:   May 10, 2010.

Respectfully submitted,

KAHN SWICK & FOTI, LLC

By: _____
Lewis S. Kahn (La. Bar No. 23805)
Albert M. Myers (application for *pro hac vice*
    Admission pending)
Paul Balanon (La. Bar No. 29076)
Melinda Nicholson (application for *pro hac vice*
    Admission pending)
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Tel. (504) 455-1400
Fax: (504) 455-1498

**Of counsel:**

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP

G. Anthony Gelderman III (La. Bar No. 17594)
2727 Prytania Street, Suite 14
New Orleans, LA 70130
Tel. (504) 899-2339
Fax: (504) 899-2342

42

Gerald H. Silk
Amy Miller
Jeremy Friedman
1285 Avenue of the Americas
New York, NY 10019
Tel. (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Randall Roche, pursuant to U.S. Code Title 28, Section 1746, hereby declare as follows:

I am authorized to make this verification by the plaintiff herein and that the facts and allegations therein contained in the foregoing Verified Derivative Complaint are true and correct to the best of my information and belief based upon discussions with and reliance upon my counsel. Plaintiff is a shareholder of BP, was a shareholder at the time of the wrongdoing complained of and remains a shareholder.  I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of BP.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Date: _May 7, 2010_

Randall Roche